### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

JOSE SALVDADOR LANTIGUA

    Petitioner,

v.                                          Case No.:  3:19-cv-1291-TJC-PDB
                                                       3:19-cv-1292-TJC-PDB
                                                       3:16-cr-125-TJC-PDB
UNITED STATES OF AMERICA,                               3:16-cr-141-TJC-PDB

    Respondent.
_____

## <u>ORDER</u>

Petitioner Jose Salvador Lantigua moves under 28 U.S.C. § 2255 to vacate his conviction and sentence. (Civ. Doc. 1, § 2255 Motion; <u>see also</u> Civ. Doc. 2, Affidavit; Civ. Doc. 7, Corrected Supplement; Civ. Doc. 9, Second Supplement.)[1] In 2016, he pled guilty to four charges stemming from an insurance fraud scheme in which he faked his death in Venezuela, returned to the United States on a fishing boat, and assumed a false identity in North Carolina. He challenges his conviction and sentence based on claims of trial court error and the ineffective assistance of counsel. The United States

_____

[1]    "Civ. Doc. #" refers to docket entries in the lead § 2255 case, No. 3:19-cv-1291-TJC-PDB, which the Court consolidated with Case Number 3:19-cv-1292-TJC-PDB. "Crim. Doc. #" refers to docket entries in the bank and wire fraud case, Number 3:16-cr-125-TJC-PDB. When the Court refers to docket entries in the passport fraud and aggravated identity theft case, No. 3:16-cr-141-TJC-PDB, the Court uses "Crim. Case No. 141 Doc. #."

responded in opposition (Civ. Doc. 13) and Petitioner replied (Civ. Doc. 15). The case is now ripe for review.

Under Rule 8(a) of the Rules Governing Section 2255 Proceedings, the Court has determined that an evidentiary hearing is unnecessary to decide the matter. No evidentiary hearing is required because Petitioner's allegations are affirmatively contradicted by the record or would not entitle him to relief even if the facts he alleges are assumed to be true. See Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015). For the reasons below, Petitioner's § 2255 Motion, as supplemented, is due to be denied.

## I.   Background

The Eleventh Circuit Court of Appeals aptly summarized the facts of the case:

> In April and August 2012, Lantigua applied to borrow $2 million in loans from Fidelity Bank (formerly known as American Enterprise Bank), a federally insured financial institution in Jacksonville, Florida. During the application process, Lantigua submitted a false and fraudulent statement of a life insurance policy from Hartford Universal Life, reflecting a cash value of more than $2.4 million, and a false and fraudulent statement of his personal assets and liabilities. Under the loan agreements, Lantigua assigned life insurance benefits as collateral. Based upon the false information provided to the bank, the loans were approved and funded.

> In early 2013, with his business financially suffering and having borrowed $2 million based on fraudulent documents, Lantigua decided to fake his own death and allow his family to collect his life insurance benefits to pay off his outstanding debt. He told his wife, Daphne Simpson, that he suffered from a fatal brain disease and had one year or less to live. He said that he could travel to South America to undergo a potentially life-saving treatment.

2

Shortly before his trip, Lantigua revealed to Simpson that he had no brain disease, but he continued to lie to her. He told her that his military past was catching up with him. He explained that he had led an Army special operations team, his team had taken out a drug cartel leader, and he was being blackmailed by a rogue CIA agent. Lantigua told Simpson he had been blackmailed into paying money to avoid exposure to the alleged cartel leader's son. He also said that members of his former team had already been killed and warned Simpson that both of their families were in danger. Simpson believed the fabricated military story and agreed to help him out of fear for their families by applying for Lantigua's life insurance benefits after he secured a sham death certificate.

Lantigua flew to Venezuela, where he obtained the fraudulent death certificate and a fraudulent certificate of cremation. Simpson met Lantigua in Venezuela and used the fraudulent death certificate and certificate of cremation to obtain a certificate of death abroad from the U.S. Embassy. She then returned to the United States with the fake certificates.

Simpson submitted false claims to seven life insurance companies, representing that Lantigua had died in Venezuela. She directed Lantigua's attorney, who was unaware of the scheme, to prepare the documents necessary to seek death benefits from the life insurance companies. The cumulative value of these policies exceeded $6.6 million, but only three of the companies paid death benefits, so Simpson only received $871,067.11. Simpson and Lantigua's unwitting attorney went to federal court in an attempt to obtain payment on at least some of the policies.

Meanwhile, Lantigua illegally returned to the United States by paying an individual $5,000 to take him from the Bahamas to Florida on a fishing boat. Lantigua and Simpson then traveled to their second home in North Carolina, where Lantigua used a New York driver's license and birth certificate in the name of "Ernest Allen Wills" to obtain a North Carolina driver's license in that name. He used his fraudulent driver's license to apply for a passport in Wills's name. Officials with the U.S. Department of State caught on to Lantigua's fraudulent passport application, and law enforcement arrested him in North Carolina.

United States v. Lantigua, 749 F. App'x 875, 877–78 (11th Cir. 2018).

In April 2015, a grand jury in the Western District of North Carolina indicted Petitioner on one count of passport fraud, in violation of 18 U.S.C. § 1542, and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Crim. Case No. 141 Doc. 1-3, W.D.N.C. Indictment.) That case was transferred to this Court in September 2016, becoming Case Number 3:16-cr-141-TJC-PDB. (Crim. Case No. 141 Doc. 1.) Meanwhile, in Case Number 3:16-cr-125-TJC-PDB, the United States charged Petitioner by information with one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, and one count of bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. (Crim. Doc. 1, M.D. Fla. Information.)

Petitioner entered guilty pleas to all four charges. He waived indictment and pled guilty to conspiracy to commit mail and wire fraud and bank fraud under a written plea agreement (Crim. Docs. 10, 12, 50), and he pled guilty to passport fraud and aggravated identity theft without a plea agreement (Crim. Case No. 141 Docs. 8, 37). The Magistrate Judge who presided over the plea colloquies recommended that, having cautioned Petitioner and examined him under oath about each subject in Rule 11, Federal Rules of Criminal Procedure, Petitioner knowingly and voluntarily admitted facts that established the elements of each offense. (Crim. Doc. 13; Crim. Case No. 141 Doc. 10.) The Court accepted Petitioner's guilty pleas and adjudicated him accordingly.

The cases proceeded to sentencing before the undersigned on February 1, 2017. The Court was familiar with Petitioner's case because the undersigned also presided over civil proceedings in which Petitioner's wife tried to recover benefits from Petitioner's life insurance policies. See Amer. Gen. Life Ins. Co. v. Lantigua, et al., No. 3:13-cv-1363-TJC-JBT, and related cases.

For Petitioner's fraud convictions, a probation officer calculated a guidelines sentencing range of 51 to 63 months in prison, based on a total offense level of 24 and a Criminal History Category of I. (Crim. Doc. 26, Presentence Investigation Report ["PSR"] ¶ 103.) The offense level included an 18-level enhancement for an intended loss amount of $8.6 million (id. ¶ 45),[2] minus three levels for acceptance of responsibility (id. ¶¶ 62–63). The guidelines sentence for Petitioner's aggravated identity theft conviction was 24 months consecutive to all other counts, yielding a total guidelines imprisonment range of 75 to 87 months. See U.S.S.G. § 2B1.6.

The Court adopted the guidelines calculation without objection. (Crim. Doc. 52, Sentencing Transcript at 5–7.) It then heard extensive argument from the parties and reviewed statements from some of the victims (id. at 10–74),

---

[2]     The actual loss amount was $2.8 million. (Crim. Doc. 26 ¶ 33.) $8.6 million represented the intended loss amount under U.S.S.G. § 2B1.1(b)(1)(J) and § 2B1.1, cmt. 3(A) (2016). (Id. ¶ 45.) The $8.6 million figure consisted of the $2 million in loans that Petitioner fraudulently obtained from American Enterprise Bank, plus the cumulative $6.6 million value of seven life insurance policies from which he tried to collect. (See id. ¶¶ 24–26.)

including Michael Wienckowski, a former friend who had loaned Petitioner over $1.7 million (id. at 38–45).[3] Before pronouncing the sentence, the Court considered the sentencing guidelines and each factor listed in 18 U.S.C. § 3553(a). (Id. at 85–98.) On Petitioner's side, the Court noted that he had "served with distinction in the military and then became a respected and valued member of his community" (id. at 88), that Petitioner had cooperated with the government and was remorseful (id. at 94), and that Petitioner was unlikely to commit another fraud, such that specific deterrence was "not a big issue" (id. at 95). But on the other side, the Court noted that Petitioner was "convicted of a particularly pernicious fraud which counts as its victims banks, insurance companies, governmental agencies, his friends, his family, and even this very court." (Id. at 88.) The Court remarked that Petitioner's wife, at Petitioner's urging, had "duped" a law firm into advocating for payment of the insurance policies in state and federal court. (Id. at 89.) Similarly, the Court observed that "[t]hese lawsuits and the events surrounding them caused the insurance companies and creditors, including the bank, and also Mr. Wienckowski, to embark on a massive and expensive investigation." (Id. at 92.) The Court commented that "the perniciousness and callousness of Mr. Lantigua's actions

---

[3]     Although Wienckowski was not a victim of a count of conviction, he and his wife spoke at the sentencing hearing about the money they lost because of Petitioner's fraud and through litigating against Petitioner and his wife to recover the money.

… set this case apart" from other fraud offenses. (<u>Id.</u> at 93.) As the Court explained: "in terms of pure evil or the willingness to involve and dupe not only your wife, but others close to you, and then others who had befriended you, … in the spectrum of frauds, it really ranks as among the more serious fraud cases I've seen." (<u>Id.</u>)

After considering these facts and the § 3553(a) factors, the Court determined that a within-guidelines sentence was "insufficient to account for the gravity of the offense, … all the persons who suffered, … the use of the court's system to try to achieve fraudulent ends, and all of the attributes of the fraud." (<u>Id.</u> at 96.) The Court determined that a total sentence of 168 months' imprisonment was warranted. (<u>Id.</u> at 97; Crim. Doc. 37, Judgment.)[4] In the Statement of Reasons filed after sentencing, the Court cited as explanations for the upward variance the nature and circumstances of the offense; the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford adequate deterrence; and the need to protect the public from further crimes of the defendant. (Crim. Doc. 38, Statement of Reasons at 3.)

---

[4]    The sentence consisted of concurrent terms of 144 months' imprisonment for conspiracy to commit mail and wire fraud and bank fraud, a concurrent term of 120 months' imprisonment for passport fraud, and a consecutive term of 24 months for aggravated identity theft. (Crim. Doc. 37.)

Petitioner appealed the Judgment, arguing that his sentence was procedurally and substantively unreasonable. <u>Lantigua</u>, 749 F. App'x at 877. Petitioner argued that the sentence was procedurally unreasonable because the Court failed to adequately explain the sentence imposed. <u>Id.</u> at 880. And Petitioner argued that the sentence was substantively unreasonable because the Court considered improper factors and weighed proper factors unreasonably. <u>Id.</u> The Eleventh Circuit rejected Petitioner's arguments and affirmed his convictions and sentence. <u>Id.</u> at 880–83.

Afterward, Petitioner sought certiorari review before the United States Supreme Court, which the Supreme Court denied. <u>Lantigua v. United States</u>, 139 S. Ct. 1586 (2019). These § 2255 proceedings timely followed.

## II.   Discussion

Under 28 U.S.C. § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 authorizes a district court to grant relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C § 2255(a). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamental as to cause a complete miscarriage of justice will warrant relief through collateral attack. <u>United States v. Addonizio</u>, 442 U.S. 178, 184-86

(1979); Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc).

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–23 (11th Cir. 2017). If "'the evidence does not clearly explain what happened … the party with the burden loses.'" Beeman, 871 F.3d at 1225 (quoting Romine v. Head, 253 F.3d 1349, 1357 (11th Cir. 2001)). A § 2255 movant will not be entitled to relief, or an evidentiary hearing, "when his claims are merely 'conclusory allegations unsupported by specifics' or 'contentions that in the face of the record are wholly incredible.'" Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

"[A] collateral attack is the preferred vehicle for an ineffective-assistance claim." United States v. Padgett, 917 F.3d 1312, 1318 (11th Cir. 2019). To establish ineffective assistance of counsel, a § 2255 petitioner must show both: (1) that his counsel's performance was constitutionally deficient, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Martin v. United States, 949 F.3d 662, 667 (11th Cir. 2020). In determining whether counsel was deficient, "[t]he standard for effective assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). "In the light of the 'strong presumption' that counsel's actions [fell] within the wide range of constitutionally adequate assistance, a movant 'must

establish that no competent counsel would have taken the [challenged] action.'"
Khan v. United States, 928 F.3d 1264, 1272 (11th Cir. 2019) (quoting Chandler
v. United States, 218 F.3d 1305, 1314-15 (11th Cir. 2000) (en banc)). To
establish prejudice, the petitioner must show a reasonable likelihood that the
result of the proceeding would have been different but for counsel's error.
Martin, 949 F.3d at 667 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)).
The Court considers the totality of the evidence in determining whether a
petitioner has established deficient performance and prejudice. Strickland, 466
U.S. at 695. However, because both prongs are necessary, "there is no reason
for a court… to approach the inquiry in the same order or even to address both
components of the inquiry if the defendant makes an insufficient showing on
one." Id. at 697.

## A. Ground One

Petitioner argues that defense counsel, Assistant Federal Defender Lisa
Call, gave ineffective assistance by not objecting to what Petitioner calls "the
sentencing judge's biased statements," meaning the Court's reference to the
Court being a victim of Petitioner's fraud. (Civ. Doc. 1 at 4.) Petitioner also
contends that counsel gave ineffective assistance by not objecting to "the
inadequate and contradictorily substantiated rationale for deviating and more
than doubling of the applicable sentencing guidelines." (Id.) According to
Petitioner, the Court's actions called its impartiality into question, such that

the undersigned should have recused himself to avoid the appearance of impropriety. (Id.)

The government argues that Petitioner "procedurally defaulted his ineffective assistance of counsel claims by failing to raise them on direct appeal." (Civ. Doc. 13 at 8.) That is wrong. The Supreme Court has held "that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255." Massaro v. United States, 538 U.S. 500, 509 (2003). The same goes for Petitioner's other ineffective assistance claims as well.

Rather, this claim fails because the underlying assertions—that the Court was biased and that the Court gave an "inadequate and contradictorily substantiated rationale" for imposing an upward variance—were raised and rejected on direct appeal. See Lantigua, 749 F. App'x at 880–83. "It is long settled that a prisoner is procedurally barred from raising arguments in a motion to vacate his sentence … that he already raised and that we rejected in his direct appeal." Stoufflet v. United States, 757 F.3d 1236, 1239 (11th Cir. 2014) (collecting cases); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000) ("Once a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255."). "The fact that [Petitioner] now frames these grounds in terms of ineffective assistance, rather than trial-court error, does not make them new claims."

Fields v. United States, No. 18-14466-F, 2019 WL 3526490, at *1 (11th Cir. Feb. 21, 2019) (order denying certificate of appealability) (citation omitted); see also Nyhuis, 211 F.3d at 1343 (recharacterizing a previously rejected claim under a different, but previously available, legal theory does not merit rehearing).

As to the Court's alleged bias, Petitioner argued on direct appeal that the sentence was substantively unreasonable because "the district court relied on an improper factor—harm to the court—in determining an appropriate sentence." Lantigua, 749 F. App'x at 881. He further argued that consideration of this factor "reflected the court's bias against him," id. at 881, and "that the district judge was biased against him and should have recused himself," id. at 881 n.3. The Eleventh Circuit concluded that the Court's remark about being a victim of Petitioner's fraud did not constitute reliance on an improper factor:

> When we place the district court's statements in context, however, we cannot agree that they were improper. The court thoroughly explained that Lantigua had improperly used the judicial system by manipulating lawyers into taking untrue positions and then requiring Lantigua's victims to litigate against Simpson to show she was not entitled to life insurance proceeds. It was only in crafting this explanation that the court mentioned that Lantigua's fraud had touched "this very court." Doc. 52 at 88. The court's fulsome explanation makes clear that it did not consider itself a victim of Lantigua's fraud in the traditional sense; instead, it was accounting for Lantigua's abuse of the judicial system generally as a means to facilitate his fraud.

Id. at 881. As to Petitioner's argument that the undersigned was biased and should have recused himself, the Eleventh Circuit found no error, "plain or otherwise," because "the district court's comments were not improper, nor did

they evidence partiality." Id. at 881 n.3. Thus, Petitioner's claim that counsel was ineffective for not objecting to these same comments must fail.[5]

As for the "the inadequate and contradictorily substantiated rationale" for varying above the guidelines range (Civ. Doc. 1 at 4), Petitioner argued on direct appeal that the Court imposed a procedurally unreasonable sentence "because it failed to explain adequately the upward variance." Lantigua, 749 F. App'x at 880. Specifically, Petitioner

> argue[d] that an inconsistency between the district court's oral pronouncement at sentencing and its written Statement of Reasons created an ambiguity in the record that prevents meaningful appellate review and requires resentencing. During the sentencing hearing, the district court stated that the need to deter Lantigua from committing additional crimes, a sentencing factor listed in § 3553(a)(2)(C), was "not a big issue" because it was unlikely that he would commit fraud in the future. Doc. 52 at 94-95. But in the Statement of Reasons completed after sentencing, the district court checked the box indicating that the need for the sentence to "protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(C))" was among the factors justifying the upward variance. Lantigua argue[d] that this inconsistency requires resentencing.

Id. The Eleventh Circuit rejected the argument, explaining:

> Lantigua argues that the oral pronouncement and the Statement of Reasons take conflicting positions on the role of deterrence in his sentence, making our review of the reasonableness of his sentence impossible. But the two are not unambiguously in conflict. Even though the district court minimized the role of specific deterrence as a justification for varying upward during the sentencing hearing, it did not entirely disregard that factor. The district court's statement that it was "unlikely" that Lantigua might reoffend was not inconsistent with its notation in the Statement of Reasons that it varied upward "[t]o protect the public from further crimes of the defendant." Doc. 52 at 95; Doc. 38

---

[5]     Likewise, Petitioner's request that the undersigned recuse from the § 2255 case (Civ. Doc. 2) is **DENIED**.

at 3.

> To the extent an orally pronounced sentence is ambiguous, "it is proper to look to the written judgment to ascertain the court's intentions." [United States v. Bonilla, 579 F.3d 1233, 1245 (11th Cir. 2009)] (internal quotation marks omitted). Here, because there was no direct conflict, to the extent the district court's oral pronouncement was ambiguous with reference to specific deterrence, the Statement of Reasons clarified the district court's intent to rely, at least in part, on specific deterrence in varying upward from Lantigua's guidelines range. Lantigua has not, therefore, demonstrated that the district court created such an ambiguity in the record as to warrant resentencing.

Id. at 880–81. Thus, Petitioner's claim that counsel was ineffective for not objecting to an allegedly inadequate or contradictory explanation for the upward variance also fails.

In short, Petitioner is not entitled to relief on Ground One because the underlying issues were litigated and resolved against him on direct appeal. Moreover, because the issues were resolved against Petitioner on appeal, he cannot demonstrate prejudice under Strickland.

## B. Ground Two

Petitioner asserts that defense counsel gave ineffective assistance "by not objecting to the district court's use of inadmissible sentencing factors and facts not in evidence," which he claims the government introduced at sentencing as "unsubstantiated allegations." (Civ. Doc. 1 at 5.) Petitioner argues that counsel should have objected to any reference to, or consideration of, facts or conduct that Petitioner did not admit in his guilty pleas or that were not included in the PSR. (Id.) He also argues that appellate counsel gave ineffective assistance "by

14

presenting erroneous sentence calculation criteria" on direct appeal. (Id.)

In an appendix to the § 2255 Motion, Petitioner identifies five issues that the prosecutor or the Court raised at sentencing to which his counsel allegedly should have objected. (Civ. Doc. 1-1.) Petitioner asserts that counsel should have objected to: (1) the prosecutor's suggestion that Petitioner, while technically a first-time offender, was not really a first-time offender because he duped Michael Wienckowski into loaning him $1.7 million (Civ. Doc. 1-1 at 1; see also Crim. Doc. 52 at 20–21); (2) the prosecutor's statement that Petitioner could have received a guidelines enhancement for jeopardizing a federally insured bank (i.e., American Enterprise Bank) (see Civ. Doc. 1-1 at 2; Crim. Doc. 52 at 16–17, 23); (3) the prosecutor's suggestion that the Court could add $1.7 million to the guidelines loss amount based on Wienckowski's loan to Petitioner (Civ. Doc. 1-1 at 3; see Crim. Doc. 52 at 23); (4) the Court's statement that the Court was a victim of Petitioner's fraud (Civ. Doc. 1-1 at 4)[6]; and (5) the Court's remark that Petitioner did not try to "put a stop" to his criminal conduct, since defense counsel allegedly had evidence that, before his arrest, Petitioner had emailed an attorney about arranging an interview with authorities (id. at 5).[7] Because of these unobjected-to arguments and remarks,

---

[6]    This issue was addressed in Ground One.

[7]    Petitioner provides no evidence that he intended to turn himself in to authorities. Even if he did, it would not change the fact—which he admitted—that

Petitioner contends, the Court effectively increased his Criminal History Category from I to II (for being a repeat offender), increased the loss amount from $8.6 million to $10.4 million (increasing the offense level based on Wienckowski's loan), added a guidelines enhancement for jeopardizing a federally insured bank, and denied him credit for acceptance of responsibility (for not stopping his criminal conduct earlier), resulting in a guidelines range of 135 to 168 months. (See Civ. Doc. 1-1 at 1–3, 5–6.)[8] Petitioner also argues that appellate counsel should have presented these guidelines "deviation[s]" to the appeals court. (Civ. Doc. 1 at 6.)

Petitioner's claim rests in part on the faulty premise that, at sentencing, a court may not consider any information beyond the factual basis or the PSR. (See Civ. Doc. 1 at 5.) Petitioner is wrong. 18 U.S.C. § 3661 provides: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

---

after he returned to the United States from Venezuela in 2013, he lived in North Carolina under a fake or stolen identity until 2015. (Crim. Doc. 50 at 31–35.) Nor would it contradict the Court's observation that at any time between 2013 and 2015, when his wife was fraudulently trying to collect the life insurance proceeds, Petitioner could have instructed her to stop the fraudulent efforts and he did not.

[8]    Petitioner suggests that he more than repaid Wienckowski for the $1.7 million loan. (See id. at 7.) Petitioner ignores that (1) Wienckowski incurred additional costs in litigating against Petitioner to recover the funds, and (2) Petitioner also took a second $500,000 loan from Wienckowski, which was repaid from the proceeds of the sale of Petitioner's condo. (See Crim. Doc. 52 at 20.) Petitioner seemingly thinks the $500,000 loan repayment should be double-credited against the $1.7 million loan as well. (See Civ. Doc. 1-1 at 7.)

United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, that the Court considered information outside the factual basis or the PSR, by itself, is not grounds for an objection, and defense counsel was not ineffective for not objecting on that basis. See Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim." (citation omitted)).

Petitioner also misconstrues the record. Contrary to his claims, the Court did not increase Petitioner's Criminal History Category or offense level based on the $1.7 million loan from Wienckowski. (See Crim. Doc. 52 at 88 (stating that the loss amount was $8.6 million, based on the victims of the counts of conviction); id. at 89, 97 (recognizing that Petitioner "had no prior criminal history" and "live[d] a crime-free life before" committing the offense conduct).) The Court did not add a guidelines enhancement for jeopardizing a federally insured bank. And it did not revoke the guidelines reduction for acceptance of responsibility because Petitioner persisted in his criminal conduct for two years. Rather, the Court adopted the PSR's calculation of the total offense level (24) and the Criminal History Category (I) (id. at 6–7, 89), which was based on a lack of criminal history, a loss amount of $8.6 million (not $10.4 million), a three-level reduction for acceptance of responsibility, and included no enhancement for jeopardizing a federally insured bank (see Crim. Doc. 26, PSR ¶¶ 44–67).

The sentence imposed expressly was not tied to the guidelines, but was an upward variance based on the § 3553(a) factors. Under 18 U.S.C. § 3553(a), a district court must consider several factors in determining a defendant's sentence, of which the sentencing guidelines are merely one. Other factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), as well as the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public, § 3553(a)(2). In deciding whether to vary above the guidelines range, a district court may consider any information relevant to a defendant's "background, character, and conduct." United States v. Tome, 611 F.3d 1371, 1379 (11th Cir. 2010). A district court may take uncharged or acquitted conduct into account, as long as such conduct has been proven by the greater weight of the evidence. United States v. Faust, 456 F.3d 1342, 1347–48 (11th Cir. 2006).

When the Court explained Petitioner's sentence, it highlighted certain facts that distinguished Petitioner's crime from other fraud offenses. (Crim. Doc. 52 at 90–92.) Petitioner admitted nearly all these facts through his guilty pleas, so counsel had no grounds to contest them. The Court noted that Petitioner created false documents to induce American Enterprise Bank to lend him $2 million; that Petitioner deceived his wife into believing he had a fatal brain disease, and then deceived her into believing that their families were in

mortal danger from a rogue CIA agent; that Petitioner went to great lengths to execute the insurance fraud scheme, including traveling to Venezuela to fake his death; that Petitioner caused his wife to hire a law firm to sue the life insurance companies in a fraudulent effort to recover the insurance proceeds, which caused the insurers to embark on costly investigations and lawsuits; and that Petitioner's conduct persisted for two years before he and his wife were found in North Carolina living under a fake identity. (Id.) All these facts were part of the factual basis for Petitioner's guilty pleas. (See Crim. Doc. 50 at 28–35; Crim. Case No. 141 Doc. 37 at 21–24.) The Court also noted Petitioner's "willing[ness] to play upon the trust and affections of his wife, his family, his friends, his faith community, and business associates to achieve his fraudulent end" (Crim. Doc. 52 at 92), a conclusion the Court drew from the facts Petitioner had admitted. In the Court's judgment, these facts supported an upward variance due to the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, and the need to afford adequate general deterrence. (Id. at 92–97; see also Crim. Doc. 38 (Statement of Reasons).)

The Court did hear and consider a statement by Michael Wienckowski about the $1.7 million he loaned Petitioner. (Crim. Doc. 52 at 38–45, 90, 91–92.) While Petitioner's conduct toward Wienckowski was not included in the PSR or the factual basis, the Court was allowed to consider any information about

Petitioner's background, character, and conduct, <u>Tome</u>, 611 F.3d at 1379, including evidence of uncharged conduct that was proven by the greater weight of the evidence, <u>Faust</u>, 456 F.3d at 1347–48. Petitioner did not, and does not, deny that he obtained a $1.7 million loan from Wienckowski under false pretenses. Nor does he identify grounds on which defense counsel could have objected to consideration of Wienckowski's statement.[9] The Eleventh Circuit "discern[ed] no error" in the Court imposing an upward variance based, in part, on Wienckowski's on-the-record statement. <u>Lantigua</u>, 749 F. App'x at 881–82.

Petitioner fails to show that sentencing counsel performed deficiently under <u>Strickland</u> by not objecting to the facts on which the Court based the upward variance. The facts that the Court cited in support of the variance were admitted by Petitioner or were on record and not genuinely disputed. Nor has Petitioner shown that he was prejudiced, <u>i.e.</u>, that there is a reasonable probability the outcome of sentencing would have been different had counsel

---

[9]      Petitioner was not caught off guard by Wienckowski's statement. Wienckowski had been involved in the proceedings since before sentencing. (<u>See</u> Crim. Doc. 52 at 5, 8.) At Petitioner's sentencing hearing, defense counsel did not object to Wienckowski offering his statement (<u>id.</u> at 32–33), but she reminded the Court that "[t]here is no mention in either the plea agreement, its factual basis or elements of Mr. Wienckowski, nor is there any mention in the PSR regarding him, because [he] was not a victim of the offense of conviction" (<u>id.</u> at 52). Defense counsel explained the circumstances of the loan and hastened to "reaffirm" that Daphne Simpson was not involved in securing that loan. (<u>Id.</u> at 58–59.) Defense counsel responded to the prosecutor's suggestion that Petitioner was a repeat offender of sorts based on his conduct toward Wienckowski, arguing that "all of these bad acts, so to speak," occurred between April and August 2012, which represented "a very limited time period out of [Petitioner's] whole life." (<u>Id.</u> at 61.)

lodged an objection. See Strickland, 466 U.S. at 694. Likewise, Petitioner fails to show that appellate counsel gave ineffective assistance in challenging the sentence, which was thoroughly litigated on direct appeal. See Lantigua, 749 F. App'x at 880–83; see also Payne v. United States, 566 F.3d 1276, 1277 (11th Cir. 2009) (recognizing that appellate counsel has no duty to raise every nonfrivolous issue, but may weed out weaker arguments to focus on one or a few key issues (citations omitted)). Relief on Ground Two is due to be denied.

### C. Ground Three

Petitioner alleges that defense counsel gave ineffective assistance at sentencing "by not objecting to the district court inappropriately dismissing § 3553 sentencing factors, which it should have used in favor of the defendant to reduce the sentence … imposed." (Civ. Doc. 1 at 7.) Petitioner claims that the Court gave insufficient weight or no weight to his acceptance of responsibility, his cooperation with the government and victims, his military service, his crime-free life before the offenses, his age (63 at sentencing), and his "deteriorating medical condition." (Id.) In other words, Petitioner argues that counsel failed to object that the sentence was substantively unreasonable. See United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (a sentence is substantively unreasonable when the district court (1) "fails to afford consideration to relevant factors that were due significant weight," (2) "gives significant weight to an improper or irrelevant factor," or (3) "commits a clear

error of judgment in considering the proper factors" by balancing proper factors unreasonably). He also asserts that appellate counsel gave ineffective assistance by "not presenting evidence showing dismissal of [the sentencing] guidelines." (Civ. Doc. 1 at 7.)

The record contradicts Petitioner's allegations. After the Court pronounced the sentence, defense counsel objected to the upward variance and the extent of the upward variance, arguing "that it produces a sentence that is unreasonably excessive." (Crim. Doc. 52 at 109–10.) Counsel continued:

> In light of [Petitioner's] age and his time in pretrial detention, he has almost two full years, versus the court's announced intention to sentence Ms. Simpson to 16 months of pretrial detention custody. And I think the total overall analysis of the factors result[s] in a sentence that is greater than necessary.

(Id. at 110.) In other words, counsel objected to the substantive reasonableness of the term of imprisonment, preserving the issue for appeal.

On direct appeal, Petitioner (through appellate counsel) challenged the procedural and substantive reasonableness of the sentence. Lantigua, 749 F. App'x at 880. As to substantive reasonableness, Petitioner "argue[d] that the district court weighed improper factors and balanced proper factors unreasonably." Id.; see also id. at 881–83. As relevant here, Petitioner argued that the Court balanced proper factors unreasonably by (1) giving "inadequate weight to the driver of his applicable guidelines range," which was the loss amount, because the Court "imposed a sentence corresponding to a loss amount

of $150 million, an amount far higher than the loss amount in his case," (2) giving "too little weight to the fact that [Petitioner] pled guilty and accepted responsibility," and (3) giving too little weight to the length of Petitioner's pretrial detention and the need to provide restitution (which, Petitioner argued, supported a shorter term of incarceration). Id. at 882. The Eleventh Circuit rejected these arguments, explaining:

> [A]lthough the district court must consider all of the applicable § 3553(a) factors, United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009), it need not give all of the factors equal weight. Instead, the sentencing court "is permitted to attach 'great weight' to one factor over others." Id. (internal quotation marks omitted). The decision about how much weight to assign a particular sentencing factor is "committed to the sound discretion of the district court." United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (internal quotation marks omitted). Considering the thoroughness and care with which the district court analyzed the § 3553(a) factors as applied to this case, the court made no clear error of judgment by assigning less weight to Lantigua's acceptance of responsibility and pretrial detention, as well as to the need to provide restitution, and more weight to the other § 3553(a) factors.

Id. at 882–83.

While appellate counsel did not argue that the Court "dismiss[ed the] guidelines," (Civ. Doc. 1 at 7), "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Payne, 566 F.3d at 1277 (internal quotation marks and citation omitted). The record does not support an argument that the Court "dismiss[ed]," or gave zero weight to, the sentencing guidelines. Instead, the Court

acknowledged the guidelines range (Crim. Doc. 52 at 6–7, 89) and recognized that "the sentencing guidelines are always influential in arriving at a sentence" (id. at 90). But the Court also recognized that the sentencing guidelines are only one of the § 3553(a) factors that a sentencing court must consider. (Id.)

The record refutes Petitioner's allegation that sentencing counsel unreasonably failed to object to the substantive reasonableness of the sentence or that appellate counsel unreasonably litigated the issue on direct appeal. Relief on Ground Three will be denied.

### D. Ground Four

Next, Petitioner contends there was an unwarranted disparity between his sentence and that of his co-conspirator, Daphne Simpson, who was sentenced to time served based on the 16 months she spent in pretrial detention. (Civ. Doc. 1 at 8.) Petitioner also contends there was an unwarranted disparity between his sentence and the sentences imposed in "similar cases." (Id.)

Petitioner procedurally defaulted this claim. He could have challenged an unwarranted sentencing disparity on direct appeal but he did not do so. "Courts have long and consistently affirmed that a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal." Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (citing United States v. Frady, 456 U.S. 152, 165 (1982)). "Under the procedural default rule, a defendant generally must advance an available challenge to a criminal conviction or sentence on direct

appeal or else the defendant is barred from presenting that claim in a § 2255 proceeding." Id. at 1234 (citations omitted). "This rule generally applies to all claims, including constitutional claims." Id. (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).

Petitioner alleges that he did not raise the unwarranted disparity claim on appeal because "sentencing counsel and appellate counsel failed to provide the courts with evidence provided by the defendant of abuse of civil rights at the pretrial detention facility, to include sexual harassment by staff of the county jail." (Civ. Doc. 1 at 8.)

A petitioner can avoid a procedural default through a showing of "cause and prejudice." Lynn, 365 F.3d at 1234 (internal quotation marks and citation omitted).[10] To "show cause for procedural default, [a petitioner] must show that some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [the petitioner's] own conduct." Id. at 1235 (citing Smith v. Jones, 256 F.3d 1135, 1145 (11th Cir. 2001)). "Ineffective assistance of counsel may satisfy the cause exception to a procedural bar," but only if the ineffective assistance claim has merit. Nyhuis, 211 F.3d at 1344 (citation omitted). The petitioner must also show that "actual prejudice" resulted from the claim not

---

[10]    Petitioner does not invoke the actual innocence exception to the procedural default rule. (Civ. Doc. 15 at 2.)

being raised on direct appeal. <u>Lynn</u>, 365 F.3d at 1234 (citing <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998)).

Petitioner fails to allege facts sufficient to establish cause for and actual prejudice resulting from the procedural default. Although he states that sentencing counsel and appellate counsel failed to present evidence that he endured civil rights abuses and sexual harassment while in pretrial detention, these allegations are conclusory and undeveloped. Nor does Petitioner explain what this has to do with establishing an unwarranted sentencing disparity.

Besides, Petitioner cannot show actual prejudice resulting from the procedural default because the issue lacks merit. At sentencing, the Court directly addressed the need to avoid unwarranted sentencing disparities, both in general and with respect to Ms. Simpson. As to other fraud cases, the Court remarked:

> I need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.
>
> And I have looked and recalled various fraud sentences I've given over the years and tried to, to the best I can, pigeonhole Mr. Lantigua's case, and at least have some consistency in the sentences that we've imposed over the years.

(Crim. Doc. 52 at 95.) The Court had observed that "in terms of pure evil or the willingness to involve and dupe not only your wife, but others close to you, … in the spectrum of frauds, it really ranks as among the more serious fraud cases I've seen." (<u>Id.</u> at 93.) The Court explained that a lengthy sentence was justified

because Petitioner had perpetrated "a particularly pernicious fraud" that affected many people. (Id. at 97.) As to Ms. Simpson, the Court said:

> And so in deciding this, I've looked at all the 3553(a) factors, and particularly to see if there's unwarranted sentencing disparity between the sentence I've given to Mr. Lantigua and that I've given to Ms. Simpson. I conclude that the disparity, which is obvious, is warranted.
>
> Ms. Simpson would never have been involved in this scheme but for being overborne and deceived by Mr. Lantigua. Mr. Lantigua also convinced her that his life, as well as hers and her family, were in danger, and, therefore, this helped her justify actions which she knew were wrong.

(Id. at 104.)

Thus, Petitioner did not suffer an unwarranted sentencing disparity, either compared to Ms. Simpson or other fraud defendants. Because the issue lacks merit and the claim is procedurally defaulted, Petitioner is entitled to no relief on Ground Four.

### E. Ground Five

In a supplemental filing, Petitioner argues that trial counsel and appellate counsel gave ineffective assistance "by not objecting to the court's acceptance of charges filed by the U.S. government against the movant, a person, who, at the time of each and all of those events, was declared legally and technically dead" by a federal agency. (Civ. Doc. 7 at 1.) Because he had been declared dead, Petitioner argues that the Court should have dismissed the charges, never issued a warrant for his arrest, and never incarcerated him.

This argument is frivolous and almost no reasonable attorney would have advanced it. Petitioner is not dead and he never was. He was falsely declared dead only because of his own fraudulent conduct. To that end, the Court entered an Order "declar[ing] that defendant Jose Salvador Lantigua is alive. Any documentation that predates this Order which purports to declare Mr. Lantigua dead is necessarily in error." (Crim. Doc. 42.) It is self-evident that Petitioner cannot profit from his own crime by using a false and fraudulently obtained death certificate to avoid criminal charges. Cf. Mich. Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 923 (11th Cir. 1998) ("That an insured should not be allowed to profit from his or her own fraud is a fundamental rule of law that requires little explanation." (citation omitted)). This claim merits no further discussion.

Petitioner also alleges, in conclusory fashion, that when he pled guilty, he and his wife were "sequestered under duress" and that his "family was under duress through intimidation and threats." (Civ. Doc. 7 at 1.) Thus, Petitioner suggests he did not plead guilty voluntarily. Petitioner fails to elaborate on these conclusory allegations. But they are also belied by the record. When Petitioner pled guilty to conspiracy to commit mail and wire fraud and bank fraud, the Court asked him whether anyone had threatened, forced, coerced, or intimidated him into waiving indictment and pleading guilty. (Crim. Doc. 50 at 17, 37.) Petitioner, who was under oath, answered no. (Id.) Likewise, when

Petitioner pled guilty to the charges of passport fraud and aggravated identity theft, the Court asked whether anyone had threatened, forced, coerced, or intimidated him into doing so. (Crim. Case No. 141 Doc. 37 at 26.) Petitioner, who was under oath, again answered no. (Id.) The Court asked Petitioner if he had "any complaints about the way you've been treated … that's causing you to plead guilty," and he answered no. (Crim. Doc. 50 at 39; Crim. Case No. 141 Doc. 37 at 27.) And Petitioner affirmed he was of sound mind to enter his guilty pleas, that he had truthfully answered the Court's questions, and that he pled guilty freely, knowingly, and intelligently. (Crim. Doc. 50 at 5–6, 37–41; Crim. Case No. 141 Doc. 37 at 7–9, 26–29.) Counsel for Petitioner and the government assured the Court they had no concerns about the plea colloquies. (Crim. Doc. 50 at 40; Crim. Case No. 141 Doc. 37 at 28.)

"[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 73–74 (1977). "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. at 74. "[W]hen a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false."

United States v. Rogers, 848 F.2d 166, 168 (11th Cir. 1988). Petitioner fails to rebut the strong presumption that his sworn statements at the plea colloquies were true. As a result, relief on Ground Five is due to be denied.

**F. Ground Six**

Finally, Petitioner alleges that the Court and the Probation Office erred in calculating the guidelines loss amount. (Civ. Doc. 9.) He says that the loss amount was incorrectly calculated using "an 'assumed' intended loss amount derived from unsubstantiated facts," a practice he claims the Eleventh Circuit renounced in United States v. Sheffield, 939 F.3d 1274 (11th Cir. 2019). (See Civ. Doc. 9 at 1.) In Sheffield, which involved the amount of restitution a defendant owed the IRS for tax fraud, the Eleventh Circuit held that when "the appropriate restitution amount is definite and easy to calculate, the government cannot satisfy its burden of proof by relying on the oft-stated (but not always applicable) principle that restitution can be based on a reasonable estimate of loss." 939 F.3d at 1276 (citation omitted).

Petitioner procedurally defaulted this claim, which is not cognizable on collateral review. Petitioner could have challenged the calculation of the guidelines loss amount on direct appeal but he failed to do so. See Lynn, 365 F.3d at 1234. Petitioner fails to establish any exception to the procedural default rule. And the claim is not cognizable under 28 U.S.C. § 2255 because a misapplication of advisory sentencing guidelines "is not a fundamental defect

that inherently results in a complete miscarriage of justice," <u>Spencer</u>, 773 F.3d at 1138, nor does it "violate an 'ancient' right" or "raise constitutional concerns," <u>id.</u> at 1140. In any event, the loss amount was correctly calculated based on (1) the $2 million loan Petitioner fraudulently obtained from American Enterprise Bank and (2) the $6.6 million cumulative value of the life insurance policies on which Petitioner tried to collect, totaling $8.6 million. The guidelines allow the loss amount to be based on the intended loss, U.S.S.G. § 2B1.1, cmt. 3(A), and the intended loss was ascertainable based on the value of the loan from American Enterprise Bank and the value of the life insurance policies. Thus, Petitioner is entitled to no relief on Ground Six.

### G. Affidavit and Reply

In his Affidavit (Civ. Doc. 2) and Reply (Civ. Doc. 15), Petitioner appears to raise additional claims not contained in the § 2255 Motion or supplemental Grounds Five and Six. In the Affidavit, Petitioner alleges that (1) counsel failed to seek dismissal of the charges because Petitioner voluntarily returned to the United States to "put an end" to the fraud, as purportedly evidenced by an email he sent an attorney about arranging an interview with authorities (even though he never did turn himself in, but continued living in North Carolina under a stolen identity while his wife sued the insurance companies); (2) the conditions of Petitioner's pretrial detention were unconstitutional, including that jail staff sexually harassed him and denied him medical treatment; (3) he was wrongfully

denied bail; (4) the conditions of his current imprisonment are unconstitutional; and (5) Petitioner had evidence in his personal property that refuted the aggravated identity theft charge. (Civ. Doc. 2 at 2–5; see also Civ. Doc. 15 at 2–3.) In his Reply, Petitioner adds allegations that (1) there were factual errors in the factual basis and the PSR (Civ. Doc. 15 at 3); and (2) he was "disoriented and incapacitated" when he pled guilty, such that he was not competent to plead guilty (id. at 5–6). Petitioner did not move for leave to amend the § 2255 Motion to raise these claims, as he did with supplemental Grounds Five and Six.

Rule 2(b) of the Rules Governing Section 2255 Proceedings requires that a petitioner "specify all the grounds for relief available to the moving party" and "state the facts supporting each ground" in the § 2255 motion. If a petitioner wishes to raise additional claims not included in the original pleading, he must move for leave to amend. See Fed. R. Civ. P. 15. To the extent Petitioner raises claims not included in the § 2255 Motion (Civ. Doc. 1), and that he did not obtain leave to raise, they are not properly before the Court. Moreover, the additional allegations are contradicted by the record, waived by his knowing and voluntary guilty plea, procedurally defaulted, or cannot support § 2255 relief.

## IV.   Conclusion

Having considered each of Petitioner's claims, and finding that none warrants relief under 28 U.S.C. § 2255, it is hereby **ORDERED**:

1. Petitioner Jose Lantigua's Motion Under 28 U.S.C. § 2255 to Vacate,

Set Aside, or Correct Sentence (Civ. Doc. 1), as supplemented (Civ. Docs. 7, 9) is **DENIED**.

2. The Clerk will enter judgment in favor of the United States and against Petitioner, and close the file.

3. If Petitioner appeals this Order, the Court denies a certificate of appealability (COA). Because this Court has determined that a COA is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[11]

   **DONE AND ORDERED** at Jacksonville, Florida this 1st day of March, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

lc 19
C:
Counsel of record
Pro se petitioner

---

[11] The Court should issue a COA only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.